**2010 BNH 021**

_____

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW HAMPSHIRE

In re:                                                                  Bk. No. 09-11681-MWV
                                                                        Chapter 13

Thomas F. DeSteph,
                          Debtor


Nancy Gembitsky,
                          Plaintiff


v.                                                                      Adv. No. 09-1090-MWV


Thomas F. DeSteph, individually and
d/b/a The DeSteph Agency, and
d/b/a TDA Advantage Trust,
                          Defendants

_Andrew R. Schulman, Esq._
_GETMAN, STACEY, SCHULTHESS & STEER P.A._
_Attorney for Nancy Gembitsky_

_Grenville Clark, Esq._
_GRAY, WENDELL & CLARK, PC_
_Attorney for Thomas F. DeSteph_


## MEMORANDUM OPINION

Nancy A. Gembitsky ("Gembitsky") brings a complaint against Thomas F. DeSteph ("DeSteph"),

The DeSteph Agency, and TDA Advantage Trust seeking damages for: (1) violation of the Connecticut

Unfair Trade Practices Act, (2) breach of contract, (5) fraud, (6) constructive trust, and (7) negligent

misrepresentation.[1]  Additionally, Gembitsky moves the Court to determine that any obligation owed by

DeSteph to the Plaintiff be excepted from discharge under § 523(a)(2) of the Bankruptcy Code,[2] and hold

that DeSteph's claimed exemptions do not apply to any property held under a constructive trust.   Beginning

---

[1]The Court previously dismissed the complaint in part.  These are the remaining counts.

[2]Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8.

March 17, 2010, the Court held a trial and took the complaint under advisement.

**JURISDICTION**

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C. § 157(b).

**BACKGROUND**

Gembitsky and DeSteph met in the fall of 2002 when the parties were introduced to each other through a mutual friend. At various times, DeSteph conducted business as The DeSteph Agency and kept a banking account, for business purposes, known as the TDA Advantage Trust. DeSteph and The DeSteph agency are one in the same. DeSteph offered financial and investment planning advice to clients including Gembitsky. Upon such advice, DeSteph helped Gembitsky transfer some of her 401(k) ("401K") plans into annuities issued by Allianz Life Insurance Company of North America ("Allianz") and American International Group, Inc. ("AIG"). In January 2003, Gembitsky gave DeSteph a check for $100,000 (the "$100,000 transfer"). Subsequently in March 2003, DeSteph executed a promissory note (the "Note") related to the $100,000 transfer. The provisions of the Note appear as follows:

**TDA Advantage Trust**
**Promissory Note**

1.     For value received, TDA Advantage Trust, promises to pay to Nancy A. Gembitsky, the amount of $100,000 according to the terms listed below.

2.     TDA Advantage Trust also agrees to pay $412.50 in monthly installments, minus 12 dollars per month service charge, for 60 months.

3.     Nancy Gembitsky will share in the profits of TDA Advantage Trust on a prorated basis at the time the note is paid. The profit is reduced by the amount of interest paid at that time.

4.     TDA Advantage Trust agrees to make one final payment for the entire balance owed on or before 1/10/2008 unless Nancy A. Gembitsky reinvests in the TDA Advantage Trust Club in increments of five-year agreements.

-2-

     5.     The value received gives no authority in the day to day operation of TDA Advantage Trust.

(Ex. 1).  DeSteph never made any payments on the Note.  All other facts, including the reasons behind the

$100,000 transfer and the Note, remain in dispute.

     In April 2009, Gembitsky filed a complaint against DeSteph in the United States District Court,

District of New Hampshire ("District Court") alleging various counts under state and federal law and seeking

damages in connection with the $100,000 transfer that took place between the parties.  DeSteph filed for

Chapter 13 bankruptcy on May 6, 2009, and Gembitsky filed her complaint with this Court on May 18, 2009.

On January 25, 2010, this Court dismissed the complaint in part.  This opinion will dispose of the remaining

counts of the complaint.

<u>DISCUSSION</u>

**I.**     **The Parties' Explanation for the $100,000 Transfer and the Note**

Because the facts are almost entirely in dispute, this case is necessarily about credibility.

     **A.**     <u>**Gembitsky's Version of Events**</u>

     Gembitsky testified that in 2002, she received a $100,000 inheritance from her mother's estate.

Gembitsky was interested in investing her inheritance and 401K plans and mentioned this interest to a co-

worker.  The co-worker recommended that Gembitsky speak to DeSteph, who the co-worker indicated was a

financial planner, investment advisor, and insurance broker that the co-worker had used for her investments.

The co-worker gave Gembitsky's contact information to DeSteph who contacted Gembitsky in October

2002.  Gembitsky and DeSteph met at a restaurant and discussed various investment options over dinner.

The meeting was strictly for business purposes.  After reviewing Gembitsky's financial records, DeSteph

made several suggestions as to how she should invest her money.

     Upon DeSteph's recommendation, Gembitsky used DeSteph and his agency to transfer several of her

401K plans into annuities with AIG and Allianz.  With regard to her inheritance, Gembitsky initially thought

about placing the money into a certificate of deposit that provided an annual yield of 5%. However, DeSteph told her that she could earn a higher yield if she put her money in a private investment known as the TDA Advantage Trust that he only offered his special clients. Specifically, the investment provided that, in exchange for $100,000, Gembitsky would hold a limited partnership interest and receive an annual yield of 6.15% to be paid in monthly installments of $512.50 for 60 months. In addition, DeSteph would provide Gembitsky with a promissory note stating the terms of the investment. Gembitsky did not understand the "limited partnership" terminology and was initially hesitant about DeSteph's proposition. She asked him to provide her with written information about the investment, but he told her that there was little paper information available. After DeSteph repeatedly pressured Gembitsky, she acquiesced and, on January 13, 2003, wrote a check for $100,000 to the TDA Advantage Trust. At the time Gembitsky wrote the check, DeSteph had not provided her with a promissory note.

Gembitsky received routine monthly statements for her AIG and Allianz accounts. She expected to receive similar information on the TDA Advantage Trust, and continually requested such documentation from DeSteph. After he failed to give her a promissory note or any written information about her investment, Gembitsky asked DeSteph to return her money. He refused and, eventually, in March 2003, he wrote and executed the abovementioned Note regarding the TDA Advantage Trust investment. DeSteph did not make any payments on the Note. When Gembitsky inquired about her payments, he told her that he reinvested the monthly payments in the TDA Advantage Trust, and that she would receive the total amount at the end of the five-year term of the Note. Hesitent about DeSteph's representation, Gembitky showed the Note to an accountant who assured her that such practice was common. As a result, Gembitsky believed that she would not receive any payments during the five-year term, but she would receive her full investment plus profits on or before January 10, 2008. When the January date passed, and Gembitsky did not receiver her payment, she contacted DeSteph who did not return her call. She continued to contact him for several more months until July 2008, when he finally told her that her money was gone.

**B.** **DeSteph's Version of Events**

DeSteph testified that Gembitsky's co-worker, who was a friend of his, contacted him regarding a blind date with Gembitsky. DeSteph then contacted Gembitsky and they began a romantic relationship. He told her about a business idea he always wanted to start, but he was without the funds to do so. At the time, Gembitsky had several sources of cash and was without employment, so she was interested in getting involved in his business venture. Simultaneously, DeSteph was also involved in litigation concerning custody of his children. Gembitsky showed a willingness to help with the litigation, and DeSteph understood this to mean that she would assist him financially.

DeSteph agreed that the two should enter a joint venture, where DeSteph would handle the sales part of the business and Gembitsky would be in charge of the administrative portion (the "joint venture"). Though they did not discuss specifics or write down a business plan, Gembitsky wrote him a check in January 2003 for $100,000 and told him that it was to help start the joint venture. She also said that he could use the $100,000 to draw a salary for The DeSteph Agency, continue his custody litigation, and to pay other incidental expenses. The joint venture never progressed beyond the $100,000 check.

In February 2003, the romantic relationship ended. Gembitsky asked DeSteph for her money back, but he could not pay her since most of it had already been used up. Gembitsky told him they would work out a repayment agreement, and that she would look into options. Gembitsky then created the Note, *supra,* and asked DeSteph to sign it. After negotiating to change some terms, DeSteph signed the Note. In April 2003, DeSteph did not make the payment required by the Note. Gembitsky called DeSteph asking for her money. He told her that he was not able to make the payment, and that he had many expenses that he had to deal with. Gembitsky told him he had to pay the money back, but that he could make payments on the Note if and when he could. He was never able to make any payments.

**C.** **What the Court Believes Actually Occurred**

After considering the testimony and evidence provided at trial, the Court believes Gembitsky's version of events. DeSteph's testimony was completely lacking in credibility. Not only was DeSteph's

-5-

testimony utterly unconvincing, but it was also inconsistent with his prior testimony in district ourt.

The evidence supports Gembitsky's testimony that she tendered the $100,000 check in January 2003, because she believed she was investing in a limited partnership known as the TDA Advantage Trust. The check is made payable to the TDA Advantage Trust, and the memo line contains the words "Limited Partnership." (Ex. 3). DeSteph claims that Gembitsky insisted on including the words "limited partnership" because she feared, that without such language, she would jeopardize her unemployment benefits. DeSteph's explanation is absolutely ridiculous, and he did not provide any tangible evidence of his suspicions. Similarly unbelievable is DeSteph's testimony that Gembitsky gave him $100,000 to use for his custody battle and to draw salary for the DeSteph Agency in which Gembitsky held no interest. Even more incredible is DeSteph's explanation for each of the terms of the Note.

Gembitsky testified that DeSteph told her she would receive a promissory note when she invested in the TDA Advantage Trust in January 2003. This never occurred. Finally, in March 2003, DeSteph executed the Note. Gembitsky claims that the provisions of the Note, albeit slightly different, support the oral agreement the parties had regarding the investment. The Court agrees. Paragraph two of the Note requires a monthly payment of $412.50 less a $12 service charge. That monthly payment is exactly $100 less than the $512.50 amount that DeSteph wrote on a piece of paper (Ex. 3) and that Gembitsky alleges DeSteph orally promised she would receive. In district court, DeSteph testified that he did not even know what a promissory note was in March 2003 despite the fact that he is in the business of financial planning. (Ex. 4). DeSteph sang quite a different tune when testifying in front of this Court. DeSteph claims that the parties actually negotiated the terms of the Note. He claims Gembitsky originally requested higher payments, but after calling several banks to find an appropriate interest rate, the parties agreed on $412.50 per month.

Paragraph three of the Note states that Gembitsky will receive profits in the TDA Advantage Trust. This, again, supports Gembitsky's testimony that DeSteph told her she would receive profits on the TDA Advantage Trust investment. DeSteph alleges that Gembitsky insisted on including paragraph three because she wanted to profit on DeSteph's business idea. This is highly improbable. DeSteph testified that when the

-6-

Note was signed, the business he wanted to create was non-existent, and he did not have any money to start the business.  He also stated that his idea never passed the initial state of the $100,000 transfer. Consequently, there would have been no reason to include a provision regarding profits for a business that did not exist, and did not have the likelihood of ever existing.

Paragraph four of the Note states that Gembitsky will receive the entire balance owed on the Note by January 10, 2008, unless she "reinvests in the TDA Advantage Trust Club."  The word "reinvests" would have no meaning in the Note, unless the TDA Advantage Trust was an investment as Gembitsky believed. Furthermore, DeSteph testified in district court that at the time of signing the Note, he wanted nothing to do with Gembitsky and believed that signing the Note was "all [he and his family] needed to do for her to go away."  (Ex. 4).  If that were the case, then it is unlikely that DeSteph would have signed a Note that leaves the door open to a relationship between the parties in the event that Gembitsky chose to reinvest.

Finally, DeSteph denies that he ever mentioned that the TDA Advantage Trust was a limited partnership, but paragraph five indicates just that when it states that the Note "gives no authority in the day to day operation of TDA Advantage Trust."  All of the evidence presented indicates that Gembitsky's testimony, more likely than not, truly depicts the events as they occurred.  The Court finds that the parties had an oral agreement, as testified by Gembitsky, which resulted in the $100,000 transfer.  However, the Court also finds that the agreement was not reduced to writing until March 2003 when DeSteph executed the Note.

## II.      Remaining Counts of the Complaint

The remaining counts of Gembitsky's complaint include: Count III for violations of the Connecticut Unfair Trade Practices Act, Count IV for breach of contract, Count V for fraud, Count VII for imposition of a constructive trust, and Count VIII for negligent misrepresentation.[3]  Gembitsky also asks that the Court determine that: (1) any debt owed to her be deemed nondischargeable in DeSteph's bankruptcy proceeding,

---

[3]The complaint actually contains twelve counts, but the parties agree that the counts not mentioned concern the relief requested.

(2) any property held in constructive trust is not subject to DeSteph's claimed exemptions. As a preliminary matter, the parties agree that Thomas DeSteph and the DeSteph Agency are one in the same, and the TDA Advantage Trust is the name of a bank account used solely by Thomas DeSteph. As a result, all three named defendants are in reality, one defendant; that defendant being DeSteph.

### A.      <u>Connecticut Unfair Trade Practices Act</u>

Under Count III of the complaint, Gembitsky alleges that DeSteph violated the Connecticut Unfair Trade Practices Act ("CUTPA") by fraudulently inducing her to give him $100,000, and executing a promissory note on the same in which he had no intentions of fulfilling. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. Ann. § 42-110b(a). "Trade" and "commerce" are defined to mean the conduct or practices of the types of businesses in the State of Connecticut. §42-110a(4). However, "[a] CUTPA violation . . . need not necessarily occur in Connecticut, but instead, the violation must be tied to a form of trade or commerce *intimately associated* with Connecticut." (emphasis in original) <u>Titan Sports v. Turner Broadcasting System</u>, 981 F.Supp. 65, 71 (D. Conn. 1997).

Connecticut courts have found that a form of trade or commerce is intimately associated with Connecticut in cases: where the defendants had their principal place of business in Connecticut; or where an out of state business targeted Connecticut residents; or where the economic impact was felt in Connecticut. <u>See</u> <u>State v. Liberty Mut. Holding Co., Inc.</u>, 2009 WL 943094 1, 6 (Conn. 2009). The testimony and evidence provided in the instant case does not support an extraterritorial application of CUTPA. The alleged form of trade or commerce in the instant case is the Note that Gembitsky claims was for an investment in the TDA Advantage Trust. The evidence suggests that both the $100,000 transfer and the related Note was a single event rather than a pattern of soliciting and transacting business somehow related to the State of Connecticut. The parties failed to provide any conclusive evidence of who created the Note and whether negotiations or the actual transaction even took place in Connecticut.

Gembitsky's testimony indicated that conversations regarding the transaction occurred over a course

of time in a Connecticut restaurant, but also at DeSteph's home in New Hampshire and on various trips outside of Connecticut.  Moreover, the Note was signed in New Hampshire.  Although an argument can be made that the economic impact was felt in Connecticut, Gembitsky testified that she believed her money was "safe" until January 2008.  By that time, Gembitsky had already moved to New York.  It seems, then, that the actual injury was sustained outside of Connecticut.  The Court concludes that there is insufficient evidence to render CUTPA liability for unfair or deceptive acts that occurred outside the State of Connecticut.

### B.    Breach of Contract

In Count IV of the complaint, Gembitsky claims damages for DeSteph's breach of contract in connection with the $100,000 transfer.  Gembitsky alleges that she gave DeSteph $100,000 in January 2003 in return for DeSteph's promise to pay interest on the money at 6.15%, to make monthly payments to Gembitsky for five years, and to return the principle with profits in January 2008.  At trial, Gembitksy offered a note in DeSteph's handwriting with the words "Limited Partnership" and "6.15% = $512.50" as evidence of the parties' agreement.  Gembitksy testified that she never received any payment on this promise.  Gembitsky also claims, and DeSteph agrees, that the parties entered into the Note, on March 10, 2003, that directly related to the $100,000 transfer.

### 1.    Whether a Contract Existed

DeSteph denies all allegations related to the promises Gembitsky claims were made in January 2003.  However, DeSteph acknowledged at trial that he entered into the Note and never made any payments on that Note.  DeSteph testified that, despite executing the Note, Gembitsky told him he could pay her "if and when he could."  Nothing on the record supports DeSteph's absurd explanation.   In sum, DeSteph admits that he entered into a contract with Gembitsky when the Note was executed, and that he breached that contract by not making payments.  The Court must next determine the terms of the contract.

### 2.    Terms of the Contract

Although Gembitsky wrote a check for $100,000 in January 2003, the Note was not executed until March 10, 2003.  Even though the parties reduced their agreement to writing, Gembitsky seeks damages

according to the terms of DeSteph's oral and written promises made in January 2003.  "Extrinsic evidence is admissible when it 'serves to aid in interpretation, or to clarify an ambiguity rather than to contradict unambiguous terms of a written agreement.'"  Ouellette v. Butler, 480 A.2d 76, 79 (N.H. 1984) (quoting Goglia v. Rand, 319 A.2d 281, 283 (N.H. 1974).  While the parties will never agree on the intentions behind the $100,000 transfer, the terms of the Note are unambiguous.[4]  "Even in the absence of ambiguity, parol evidence may be admitted to prove the existence of unexpressed terms or conditions that are not inconsistent with the writing."  Richey v. Leighton, 632 A.2d 1215, 1216 (N.H. 1993).  Here, evidence of DeSteph's oral and written promises made in January 2003 contradict the express terms of the Note.  The promise made in January 2003 required interest payments of 6.15% or $512.50 per month, whereas the Note promises monthly payments of $412.50.  Therefore, the Note governs the terms of the contract.

### 3.      Statute of Limitations

The Court previously ruled that the statute of limitations barred Gembitsky from seeking damages on part of her breach of contract claim.  In New Hampshire, "[e]xcept as otherwise provided by law, all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of . . . ."  N.H. Rev. Stat. Ann. § 508:4, I.  A claim for breach of contract is a personal action that accrues at the time of the breach.  Pierce v. Metropolitan Life Ins. Co., 307 F. Supp. 2d 325, 328 (D.N.H. 2004).  The Note required DeSteph, among other things, to make sixty monthly payments beginning in April 2003.  "[W]hen an obligation is to be paid in installments the statute of limitations runs only against each installment as it becomes due . . . ."  Id. (quoting Gen. Theraphysical, Inc. v. Dupuis, 385 A.2d 227 (N.H. 1978).  Since Gembitsky did not file her complaint in district court until April 22, 2009, she is only entitled to damages on her claim beginning on April 22, 2006.

### 4.      Damages

According to the terms of the Note, DeSteph agreed to pay Gembitsky: (1) $100,000, and (2) pay

---

[4]There may be an argument that the portion relating to profits of the TDA Advantage Trust is ambiguous.  However, this is inconsequential to the breach of contract claim, because Gembitsky does not request profits in her prayer for relief and the evidence presented at trial indicates no profits exist.

monthly payments of $412.50 for sixty months less $12 per month for service charges.  The Note required the principal balance to be paid on or before January 10, 2008.  The evidence presented unequivocally shows that Gembitsky is entitled to damages for her claim.  Those damages include the initial $100,000 plus monthly interest payments of $400.50 due on the Note from April 22, 2006, until the end of the Note term on January 10, 2008.

> ### C.    <u>Fraud</u>

Under New Hampshire law, in order to succeed on a claim of a fraud, "[t]he party seeking to prove fraud must establish that the other party 'made a representation with knowledge of its falsity or with conscious indifference to its truth with the intention to cause another to rely upon it.'"  In addition, the party seeking to prove fraud 'must demonstrate justifiable reliance.'"  <u>Van Der Stok v. Van Voorhees</u>, 866 A.2d 972,975 (N.H. 2005)(quoting <u>Snierson v. Scruton</u>, 761 A.2d 1046, 1049 (N.H. 2000)).  "Fraud must be proved by clear and convincing evidence, but such proof may be founded upon circumstantial evidence."  <u>Caledonia, Inc. v. Trainor</u>, 459 A.2d 613, 618 (N.H. 1983).  Unlike a breach of contract claim, parties are not barred fron introducing parol evidence to support a claim for fraud.

Because the parties offer different stories as to the circumstances involving the $100,000 transfer - each party wholly denying the events as described by the other - this claim relies on the weight of circumstantial evidence.  As stated, *supra*, the Court believes that the events occurred as Gembitsky claims they did.

> ### 1.        **Made a Representation**

Gembitsky claims that DeSteph made the following representations: (1) that Gembitsky would be investing in a limited partnership; (2) that Gembitsky would receive 6.15% interest per month on her investment; (3) that Gembitsky would be repaid her $100,000 in January 2008; and (4) that Gembitsky would share in the profits of the TDA Advantage Trust.

As previously discussed, the Note was simply the parties' written contract of their oral agreement.  The oral representations are the statements Gembitsky claims were made by DeSteph prior to her giving him

$100,000.  The evidence supports the fact that DeSteph made the representations that Gembitsky claims he made.  The memo line on the check and the language of the Note support the claim that DeSteph told Gembitsky she was investing in a limited partnership.

Gembitsky next alleges that DeSteph made a representation to her that she would receive 6.15% interest per month on her investment.  Gembitsky provided evidence of a note handwritten by DeSteph with the words "Limited Partnership - 6.15% = $512.50."  Although DeSteph admits to writing the note, he denies that it had anything to do with the $100,000 transfer.  As Judge Muirhead interestingly noted during Gembitsky's request for a preliminary injunction in this case, $512.50 represents the monthly earnings on the annual yield based on a $100,000 investment at 6.15%.  Gembitsky v. DeSteph, 2009 WL 1273770 1, 3 n.2 (D.N.H 2009).  Moreover, the Note provides for monthly interest payments of $412.50, exactly $100 less than the amount Gembitsky claims DeSteph stated she would receive.  Based on Gembitsky's testimony and the similarities between the monthly payments in the Note and DeSteph's writing containing "6.15% = $512.50," the Court finds that DeSteph made a representation to Gembitsky that she would receive monthly interest payments on her investment at a rate of 6.15%.

Gembitsky also claims that DeSteph made a representation to her that she would receive her initial $100,000 investment back by January 10, 2008.  DeSteph acknowledged that the $100,000 transfer occurred in January 2003, and that the Note executed in March 2003 related to that transfer.  He also agrees that he signed the Note.  He only denies that the $100,000 transfer occurred for the reasons stated by Gembitsky.  The Note promises, for value received, to pay Gembitsky $100,000 and states that the payment will occur on or before January 10, 2008.  Gembitsky testified that at the time she made the investment, the terms of that investment provided for a return of her principal in five years.  The $100,000 check is dated January 13, 2003.  The Note provides for a return of the principal balance on or before January 10, 2008 – only three days shy of five years from the date of the check –  rather than five years from the date of the Note.  Accordingly, the evidence presented shows that DeSteph made a representation that he would repay Gembitsky her $100,00 by January 10, 2008.

Finally, Gembitsky alleges that DeSteph made a representation to her that she would share in any profits generated by the TDA Advantage Trust.  As with the statement involving repayment of the initial $100,000, the Note signed by DeSteph states that Gembitsky will share in the profits of the TDA Advantage Trust.  The Court finds that Gembitsky met her burden of proof in showing that DeSteph made the alleged representations found in the complaint.

**2.    With Knowledge of its Falsity**

"'A representation of the maker's own intention to do . . . a particular thing is fraudulent if he does not have that intention' at the time he makes the representation."  <u>Palmacci v. Umpierrez</u>, 121 F.3d 781, 786 (1st Cir. 1997) (quoting <u>Restatement (Second) of Torts § 525 (1977)</u>).  "On the other hand, if, at the time he makes a promise, the maker honestly intends to keep it but later changes his mind or fails or refuses to carry his expressed intention into effect, there has been no misrepresentation."  <u>Palmacci</u>, 121 F.3d at 786.  Therefore, there can be no fraud if the maker represents a future intent to do something, unless the maker never intended to perform.

Gembitsky claims that DeSteph made these misrepresentations knowing he had no intention of paying her.  The Court agrees and finds that DeSteph never intended to perform.  No part of Gembitsky's $100,000 was ever invested into a limited partnership known as the TDA Advantage Trust.  DeSteph deposited Gembitsky's check on January 14, 2003 into the TDA Advantage Trust.  When he did that, he commingled her funds with funds he used to pay premiums on behalf of another client.  (Exs. 8 and 9).  Furthermore, the TDA Advantage Trust Account was without sufficient funds to cover the total amount of checks that had been written on the account until DeSteph deposited Gembitsky's check into the account.  <u>See</u> <u>id.</u>  (Specifically, some of Gembitsky's money was  used to pay Allianz on behalf of another client.)  Within a week of receiving and depositing Gembitsky's check, DeSteph transferred funds from the TDA Advantage Trust Account to his business account at the DeSteph Agency.  Right away, DeSteph was using Gembitsky's money for purposes other than what he had promised her.  The evidence clearly shows that at the time DeSteph represented to Gembitsky that he would invest her $100,000, he never intended to follow through with his intention.

-13-

These misrepresentations continued up until 2008.  DeSteph never made a single payment to Gembitsky in connection with the $100,000 and each time Gembitsky requested documentation or inquired into her payments, DeSteph provided an excuse as to his non-action.  He continued to mislead her as to why she was not receiving her promised monthly payment so she would not suspect anything.

DeSteph would like the Court to believe that he was without funds to pay Gembitsky any part of her $100,000, and that he executed the Note in March 2003 for that reason.  However, DeSteph testified that soon after signing the Note, he purchased a vehicle using $30,000 in cash.  DeSteph also testified in district court that when he signed the Note, he did not intend to adhere to the agreement.  (Ex. 4).  DeSteph's testimony on cross-examination was as follows:

Q.    So as of March '03, your testimony is that TDA Advantage Trust was going to be a partnership, you were going to run it and she was going to finance it: correct?

A.    Those are words that she had in there and that's what I signed to get rid of her, yes.

Q.    Did you mean it when you signed it?

A.    No.

Q.    Were you lying when you signed it?

A.    No.

Q.    What did you think you were doing if you neither meant it nor were lying when you signed it?

A.    I was relying on her word that she was going to go away.  I could use the money for whatever I need it for, especially with the girls, and pay it back when I could, if I could.

(Ex. 4 page 31-32).  The evidence supports a finding that DeSteph obtained $100,000 from Gembitsky in January 2003 knowing full well at that time that he was not going to invest it or return her money.  Those false representations induced Gembitksy to give DeSteph a check for $100,000.

### 3.    Justifiable Reliance

Gembitsky's testimony further revealed that she justifiably relied on DeSteph's initial statements and his continuous misleading statements to her detriment.  Although DeSteph never provided Gembitsky with written information regarding the TDA Advantage Trust investment as she requested, she had successfully

used DeSteph and his agency to transfer her 401K plans.  Even though Gembitsky had doubts when DeSteph told her the monthly profit payments were "rolling into her investment," she confirmed such practice with an accountant.  The evidence also indicates that DeSteph assured Gembitsky that her money was safe for the five-year term of the Note giving Gembitsky no reason to question non-payment until January 2008.  The Court is convinced that Gembitsky's reliance on DeSteph's false statements was justifiable.  Gembitsky also showed that she relied on DeSteph's representations to her detriment, because has never received any repayment on the $100,000 transfer.

### 4. Statute of Limitations

DeSteph alleges that even if Gembitsky has a claim for fraud, it is barred by the statute of limitations.  A claim for fraud is a personal action governed by the three-year statute of limitations period in N.H. Rev. Stat. Ann. § 508:4, I.  Although DeSteph's misrepresentation began in 2003, they continued until sometime in 2008.  Section 508:4 incorporates the discovery rule.  Under the discovery rule, "when the injury and its casual relationship to the act or omission were not discovered and could not reasonably have been discovered at the time of the act or omission," a claim accrues within three years of the time when the plaintiff "discovers, or in the exercise of reasonable diligence should have discovered, the injury and its casual relationship to the act or omission complained of."  Archdiocese of San Salvador v. FM Intern., Inc., 2006 WL 437493 1, 3 (D.N.H. 2006).

Gembitsky did not discover that the statements DeSteph made were fraudulent until sometime in 2008, because she justifiably relied on DeSteph's excuses for non-performance and an accountant's statement that DeSteph's practices regarding "rolling profits" was customary.  As a result, Gembitsky could not have reasonably discovered that DeSteph's statements were untrue at the time he initially made them.  Accordingly, Gembitsky's fraud claim is within the statute of limitations.  The Court finds that Gembitsky met her burden in showing that DeSteph made several misrepresentations that he knew were false, and that Gembitsky justifiably relied on these statements to her detriment when she wrote a check to the TDA Advantage Trust for $100,000, which has never been repaid.  Accordingly, the Court finds in favor of the Plaintiff on her claim for fraud.

-15-

**5.      Damages**

The TDA Advantage Trust never existed.  Therefore, there is no limited partnership and no profits exist.  The only recoverable damages under Gembitsky's fraud claim is the $100,000 that DeSteph promised to repay her in January 2008, and the monthly interest payments.  Although DeSteph promised to pay Gembitsky interest payments at a rate of 6.15%, Gembitsky agreed to a lower rate of $400.50 per month when she accepted the Note.  Thus, Gembitsky is entitled to damages on her fraud claim in the amount of $100,000 plus $400.50 per month for sixty months accruing as of February 2003.

**D.      Negligent Misrepresentation**

In Count VIII of the complaint, Gembitsky alleges negligent misrepresentation by claiming that DeSteph made several misrepresentations which induced her to invest $100,000 in the TDA Advantage Trust.  Gembitsky's claim for negligent misrepresentation is basically a rehash of her fraud claim.  In addition, Gembitsky seeks the same damages in both her fraud and negligent misrepresentation claims.  "A plaintiff's recovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory."  Borden v. Paul Revere Life Ins, Co., 935 F.2d 370, 383 (1st Cir. 1991).  Accordingly, the Court does not need to reach the merits of Count VIII of the complaint, since Gembitsky is denied recovery under the duplicative recovery theory.

**E.      Constructive Trust**

Count VII of the complaint involves an action to impose a constructive trust on DeSteph's property. Gembitsky claims that DeSteph violated a duty imposed by a confidential and fiduciary relationship when he failed to use her money as instructed and instead purchased a condominium and 2003 Chrysler Town & Country van.  As a result, Gembitsky seeks to impose a constructive trust on the aforementioned property.

**1.      Evidence Supporting Imposition of a Constructive Trust**

"A constructive trust may be imposed when clear and convincing evidence shows that a confidential relationship existed between two people, that one of them transferred property to the other, and that the person receiving the property would be unjustly enriched by retaining the property, regardless of whether the person obtained the property honestly."  In re Estate of Cass, 719 A.2d 595, 598 (N.H. 1998).  "A

-16-

confidential relationship exists if there is a personal relationship of such character that the transferor is justified in believing that the transferee will act in his interest." Wrenn Assoc., Inc. v. John J. Paonessa Co., Inc. (In re Wrenn Associates, Inc.), 2005 WL 1745647 1, 2 (Bankr. D.N.H. 2005). "It is sufficient to establish the character of a personal relationship is such that the party seeking to establish the trust was justified in believing that a transferee would act in his interest and that the transferee failed to perform that promise." Id.

The Court finds that a confidential relationship existed between the parties. At the very least, the testimony shows that the parties were friends at some point in time. They had gone on vacations together, and Gembitsky even cared for DeSteph's children. The evidence presented at trial indicates that the parties had a personal relationship in which either party could justifiably rely on the other to act in his or her best interest. Gembitsky sufficiently establishes that she was justified in believing that DeSteph would act in her interest and actually invest her money into the TDA Advantage Trust as he promised.

The Court is satisfied that DeSteph would be unjustly enriched if a constructive trust were not imposed. DeSteph never invested Gembitsky's money. Furthermore, DeSteph admits that he never made any payments on the Note. Instead, DeSteph used Gembitsky's money to pay himself a salary and fight for custody of his children from a previous marriage. Additionally, DeSteph told Gembitsky he had no money to pay her back any portion of her $100,000, but soon after executing the Note, he bought a 2003 Chrysler Town & Country van using $30,000 in cash.

### 2.     Identifying Trust Fund or Property

"[E]ven if the [Plaintiff] can prove the elements of a constructive trust by clear and convincing evidence . . ., [she] must then identify the trust fund or property and, if the trust funds have been commingled with general property of the Debtor, [she] must also sufficiently trace the funds of the trust." In re Wrenn Associates, Inc.), 2005 WL 1745647 at 3 (citing Conn. Gen. Life Ins. Co. v. Universal Ins. Co., 838 F.2d 612, 618 (1st Cir. 1988)). Gembitsky claims that the funds DeSteph used to purchase a 2003 Chrysler Town & Country van and to make a down payment on his condominium can be directly traced back to her $100,000 transfer. DeSteph testified at trial that he used cash from the TDA Advantage Trust account to

-17-

purchase the 2003 Chrysler Town & Country van shortly after the Note was signed.  DeSteph admits that the funds to purchase the 2003 Chrysler Town & Country van came from Gembitsky's $100,000 deposit, but claims that he believed that once he signed the Note, the money belonged to him.  Based on the evidence and testimony presented, the funds used to purchase the 2003 Chrysler Town & Country van are directly traceable back to the $100,000 transfer.

Connecting Gembitsky's $100,000 to DeSteph's down payment on his condominium proved to be more difficult.  DeSteph purchased his condominium in the fall of 2004.  DeSteph claims that no part of the down payment came from Gembitsky's money, because by that point either the money had been commingled with DeSteph's own money, or Gembitsky's money had already been spent.  After hearing testimony and reviewing the evidence on the record, Gembitsky does not sufficiently trace the funds used to pay the down payment on DeSteph's condominium to her $100,000.

DeSteph deposited Gembitsky's $100,000 check into the TDA Advantage Trust account in January 2003.  By May 2003, the TDA Advantage Trust account had been completely depleted.  Some of the funds from the TDA Advantage Trust account were transferred to the DeSteph Agency and/or DeSteph's personal account.  From there, DeSteph made several deposits and withdrawals that lead to commingling of funds.  Between May 2003 and September 2004, when DeSteph made the down payment on his condominium, money was continuously going in and out of DeSteph's bank accounts.  The evidence cannot sufficiently show that the funds used for DeSteph's down payment came from Gembitsky's $100,000 as opposed to DeSteph's own money.

### 3.    Statute of Limitations

DeSteph alleges that Gembitsky's constructive trust claim is barred by the statute of limitations.  Similar to fraud, a claim for the imposition of a constructive trust is a personal action governed by the limitations period in N.H. Rev. Stat. Ann. § 508:4, I, which incorporates the discovery rule.  As previously discussed, Gembitsky could not have reasonably discovered DeSteph's intentions until sometime in 2008.  Consequently, the Court finds that the facts of this case warrant the imposition of a constructive trust in favor of Gembitsky on DeSteph's 2003 Chrysler Town & Country van, but not on his condominium.

### III. Application of Exemptions to Property Placed In Constructive Trust

Gembitsky also requests that this Court hold that DeSteph is not entitled to claim an exemption in any property placed in a constructive trust under Count VII of the complaint. DeSteph listed the 2003 Chrysler Town & Country van as exempt property on Schedule C of his bankruptcy petition. The deadline for objecting to exemptions has passed, and no one has objected to DeSteph's claim of exemptions. Therefore, the property is excluded from DeSteph's bankruptcy estate and is not available to creditors. Since the constructive trust is being imposed on the 2003 Chrysler Town & Country van after it has already been removed from the bankruptcy estate, this Court finds no reason to decide whether imposition of a constructive trust bars a claim of exemption in the trust property. As a result of the constructive trust, the Court finds that the 2003 Chrysler Town & Country van shall be turned over to Gembitsky.

### IV. Non-Dischargeability Under § 523(a)(2)

Gembitsky requests that any judgment rendered against DeSteph be held non-dischargeable in his bankruptcy case. Gembitsky alleges that non-dischargeability is proper under § 523(a)(2) because DeSteph incurred a debt to Gembitsky for money obtained by false pretenses, false representations, and/or actual fraud. Pursuant to § 1328(a)(2), "the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of the title, except any debt . . . of the kind specified in . . . paragraph (2) of section 523(a)." 11 U.S.C. § 1328(a). Section 523(a)(2)(A) of the Bankruptcy Code provides:

> A discharge under section 727 . . . or 1328(b) of this title does not discharge an individual debtor from any debt –
> . . .
> (2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained by –
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . . .

11 U.S.C. § 523(a)(2)(A).

Exceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's "fresh start" policy and in favor of the debtor. See Palmacci v. Umpierrez, 121 F.3d 781, 786 (1st Cir. 1997). The claimant must show that her "claim comes squarely within an exception enumerated in . . . § 523(a)." Id. However, Congress included certain sections in the Bankruptcy Code, like § 523(a)(2)(A), "to make certain

that bankruptcy protection is not afforded to debtors who have obtained [money] by means of a fraudulent misrepresentation." Id. at 786.  The standard of proof for each element of a dischargeability exception is by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 285 (1991).  "The burden of proof and the burden of production as to each element rests with the party contesting the dischargeability of a particular debt under Bankruptcy Code § 523." Palmacci, 121 F.3d at 787.

To establish that a debt is non-dischargeable under § 523(a)(2)(A), the objecting creditor must prove the following elements:

1. The debtor made a knowingly false representation;

2. The debtor did so with fraudulent intent, i.e., with "scienter;"

3. The debtor intended to induce the creditor to rely on the misrepresentation;

4. The misrepresentation induced reliance;

5. Reliance was justifiable; and

6. Reliance on the misrepresentation caused damage (pecuniary loss).

See McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001); Palmacci, 121 F.3d at 786; and Reilly v. Beeman (In re Beeman), 225 B.R. 522, 528 (Bankr. D.N.H. 1998).  Gembitsky is required to establish that she has a claim against DeSteph and that the claim should not be discharged in bankruptcy.  Palmacci, 121 F.3d at 786.  In this case, both the claim and reason for exception to discharge are the same: the common law tort of fraud.  Id.  The Court has already conducted a lengthy and thorough analysis of Gembitsky's fraud claim and has found in favor of Gembitsky.  See Id. at n. 2 ("the Court construed § 523(a)(2)(A) to incorporate the 'general common law of torts.'").  Moreover, the standard for fraud in New Hampshire is higher than that required to prove nondischageability.  Accordingly, the Court finds that Gembitsky met her burden of proof and her claim against DeSteph for fraud is excepted from discharge in his bankruptcy.

**V.    Total Damages**

The facts underlying the fraud claim and breach of contract claim are identical and seek similar damages.  While Gembitsky is entitled to damages on her claims, she cannot recover duplicative damages for

the same conduct.  Borden, 935 F.2d 370.  See also Calimlim v. Foreign Car Center, Inc., 467 N.E.2d 443, 448 (Mass. 1984) ("[W]here the same acts cause the same injury under more than one theory [] duplicative damage recoveries will not be permitted.").  Consequently, Gembitsky is entitled to a total monetary award of $124,030.  That amount includes Gembitsky's initial $100,000 payment to DeSteph and the interest payments of $400.50 per month for sixty months.  Since Gembitsky was to receive the entire balance owed on January 10, 2008, she is also entitled to interest on her claim.  As a result of the constructive trust, Gembitsky is also entitled to turnover of the 2003 Chrysler Town & Country Van.  Any value realized from the turnover of the 2003 Chrysler Town & Country Van shall be credited against the total damages owed.

Gembitsky also requested attorney's fees.  However, she is not contractually entitled to attorney's fees since they were not provided for in the Note.  Gembitsky also failed to provide any statutory or common law support for an award for attorney's fees.  Accordingly, the Court finds Gembitsky is not entitled to an award for attorney's fees.

### CONCLUSION

For the reasons set out herein, the complaint is granted as to Counts IV, V, and VII, but denied as to Counts III and VIII.  The Court orders DeSteph to turnover the 2003 Chrysler Town & Country van to Gembitsky.  The Court also awards Gembitsky actual damages in the amount of $124,030 plus interest accruing as of January 10, 2008.  Any value realized from the turnover of the 2003 Chrysler Town & Country Van shall be credited against the total monetary damages owed.  Additionally, the Court finds that the debt owed by DeSteph to Gembitsky is excepted from discharge in his bankruptcy proceeding.  This opinion constitutes the Court's findings and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.  The Court will issue a separate final judgment consistent with this opinion.

DATED this 26th day of May, 2010, at Manchester, New Hampshire.

/s/ Mark W. Vaughn
Mark W. Vaughn
Chief Judge